**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TERRANCE WILLIAMS, individually and on behalf of a nationwide class of similarly situated individuals, | |
| Plaintiff, | Case no. 1:18-cv-01527 |
| v. | |
| ARGOSY UNIVERSITY OF CALIFORNIA, LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff TERRANCE WILLIAMS ("Plaintiff"), by and through his attorney, James C. Vlahakis of Sulaiman Law Group, Ltd., brings this Class Action Complaint against Defendant ARGOSY UNIVERSITY OF CALIFORNIA, LLC for damages, declaratory relief and injunctive relief pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3):

**I.     INTRODUCTION**

1.     Plaintiff has brought this civil action pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, *et seq.* (the "TCFPA").

2.     The TCPA makes it unlawful for a person to call another person's cellular telephone using an "automatic telephone dialing system" or "artificial or prerecorded voice" without the express consent of the person being called.   47 U.S.C. § 227(b)(1)(A)(iii).

3.     The TCFPA prohibits "[a]busive telemarketing acts or practices."  16 C.F.R 310.4(a).

4.     The TCFPA makes it unlawful for a person to call another person's cellular telephone and deliver a "prerecorded messages . . . to induce the purchase of any good or service" unless "the seller has obtained from the recipient of the call an express agreement, in writing." *See*, 16 C.F.R 310.4(b)(1)(v)(A).

5.     Plaintiff seeks to redress Defendants' unlawful conduct in autodialing his cellular number without his consent to deliver unsolicited prerecorded telemarketing messages on behalf of Defendant ARGOSY.

**II.     PARTIES, JURISDICTION AND VENUE**

6.     Plaintiff TERRANCE WILLIAMS is a resident of Illinois, is a natural "person" as defined by 47 U.S.C. §153(39) and his cellular telephone number (815)-905-4921 (hereafter "Plaintiff's cellular number")

7.     Defendant ARGOSY UNIVERSITY OF CALIFORNIA, LLC ("ARGOSY") is authorized and licensed to do business in the State of Illinois.

8.     ARGOSY is, and at all times mentioned herein was, a corporation and a "person" as defined by 47 U.S.C. §153(39).

9.     ARGOSY has maintained a significant and continuing presence in major metropolitan markets across the United States like Chicago through its advertising, telemarketing and studies.

10.     According to ARGOSY'S website, "Argosy University, Chicago offers a rigorous and supportive academic environment in the areas of education, business, health sciences and psychology; set in a city renowned for culture and history."

11.     The contact information for ARGOSY'S Chicago campus is listed as 225 North Michigan Avenue, Suite 1300.

12.     ARGOSY's website identifies a Schaumburg, Illinois Campus at 1000 N. Plaza Drive, Suite 324.

13.     ARGOSY provides online classes for students.

14.     ARGOSY has engaged in the practice of telephonic marketing to contact prospective students.

15.     According to a 10-K filing made by ARGOSY's prior owner, Education Management Corporation ("EMC"):

> Our marketing teams employ an integrated, cross-channel marketing approach that utilizes a variety of communications channels to engage prospective students, including Internet-based advertising such as natural and paid search; display advertising; the direct purchase of inquiries from online education content publishers; and lead aggregators. In addition, we leverage significant traditional media, which include: television and print media advertising; radio; local newspaper; and engaging prospective students directly via telephone, e-mail and direct mail campaigns.

16.     According to EMC's October 16, 2014, 10-K filing, it recognized that its telemarketing practices were subject to the TCPA:

> ***Government laws and regulations are evolving and unfavorable changes could harm our business.***
>
> We are subject to general business regulations and laws, as well as regulations and laws specifically governing the post-secondary industry. Existing and future laws, regulations, and executive orders may impede our growth. These regulations, laws, and orders may cover consumer protection, taxation, privacy, data protection, marketing, pricing, content, copyrights, distribution, mobile communications, electronic device certification, electronic waste, electronic contracts and other communications and Internet services. An amendment to the U. S. Telephone Consumer Protection Act of 1991 became effective on October 16, 2013 which, among other things, requires specific prior written consent from consumers in order to place telemarketing calls to wireless phones using an automatic telephone dialing system. The Canadian Anti-Spam Law which, among other things, generally requires the senders of commercial electronic messages to first verify consent of recipients located in Canada, became effective as of July 1, 2014. We use telephonic communications with prospective students and we believe implementation of the new rules contributed to lower than anticipated application production across our organization for future academic terms due to delays in contacting prospective students in fiscal 2014.

* * *

> We are exposed to risk regarding the unauthorized use and disclosure of such information, including but not limited to risks associated with compliance with the U. S. Telephone Consumer Protection Act which, effective October 2013, requires prior express written consent to use of automatic telephone dialing systems[.]

17. ARGOSY was owned by ECM, a Pennsylvania based corporation, until on or about October 17, 2017, when ECM sold ARGOSY to Dream Center Education Holdings, LLC ("Dream Center"), a Pittsburg, Pennsylvania, based company.

18. According to Dream Center's March 3, 2017, press release:

> Education Management Corporation is one of the largest providers of post-secondary education in the United States, based on student enrollment and revenue, with a total of 102 locations in 31 U.S. states. The company offers academic programs to students through campus-based and online instruction, or through a combination of both. The company is committed to offering quality academic programs and strives to improve the learning experience for its students. Its educational institutions offer students the opportunity to earn undergraduate and graduate degrees and certain specialized non-degree diplomas in a broad range of disciplines, including business, culinary, design, education, fashion, health sciences, information technology, legal, media arts, and psychology and behavioral sciences.

19. Dream Center's January 20, 2018, press release (along with its website) describes itself as follows:

> Dream Center Education Holdings, LLC provides post-secondary education in the United States. Its educational institutions offer students the opportunity to earn undergraduate and graduate degrees and certain specialized non-degree diplomas in a broad range of disciplines, including business, culinary, design, education, fashion, health sciences, information technology, legal, media arts, and psychology and behavioral sciences.

20. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1337 because this is a civil action for damages arising pursuant to the TCPA and TCFPA and this case arises out of violation of federal law. *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740 (2012).

21.     This Court has federal question jurisdiction and venue pursuant to 15 U.S.C. § 6104(f) which provides that "[a]ny civil action brought under subsection (a) in a district court of the United States may be brought in the district in which the defendant is found, is an inhabitant, or transacts business or wherever venue is proper under section 1391 of title 28."

22.     Alternatively, this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d)(2) because the amount in controversy exceeds $5,000,000, in the aggregate (exclusive of interest and costs).

23.     The amount in controversy easily exceeds $5,000,000, because the TCPA provides for a minimum of $500 per violation, and Plaintiff asserts a national class, which will result in at least one Class member from a different state.

24.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 18 U.S.C. § 1391(b) because ARGOSY is subject to personal jurisdiction within this District by virtue of the fact that it has conducted significant and continuous advertising, telemarketing and online studies within this jurisdiction.

25.     Venue is proper in this district because Defendants maintain, promote and operate campus in Chicago and Schaumburg, Illinois.

26.     Venue and personal jurisdiction exist in this District pursuant to U.S.C. §§ 1391(b)-(c) and 1441(a) because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced.

27.     Alternatively, Defendants' contacts with this District are sufficient to subject it to personal jurisdiction in this District.

### III.    SUMMARY OF CLAIMS

28.    Starting on or about October 2017, ARGOSY called Plaintiff's cellular number.

29.    ARGOSY called Plaintiff's cellular number for the purpose of delivering or engaging in "telephone solicitation" as this term is used by 47 U.S.C. § 227(a)(4) "for the purpose of encouraging" Plaintiff to "purchase" educational "services" from ARGOSY.

30.    ARGOSY called Plaintiff's cellular number for the purpose of delivering an "unsolicited advertisement" as this term is used by 47 U.S.C. § 227(a)(5) regarding "the commercial availability" of educational "services" from ARGOSY.

31.    ARGOSY called Plaintiff's cellular number and delivered prerecorded messages on behalf of ARGOSY.

32.    When Plaintiff answered some of the calls placed by ARGOSY, to the best of his information, knowledge and belief, he recalls that he was met with a period of silence followed by an automated click at which point the call would sometimes connect to a human.

33.    Plaintiff never provided his cellular number to ARGOSY nor did he provide ARGOSY with "prior express written consent" to allow ARGOSY to transmit telemarketing messages to his cellular number.

34.    As discussed below, on information and belief, the calls that ARGOSY placed to Plaintiff's cellular number were placed with an automatic telephone dialing system as defined by the TCPA.

35.    Alternatively, as discussed below, on information and belief, the calls to Plaintiff's cellular phone were placed with "predictive dialer" as this term has been defined by the Federal Communications Commission ("FCC").

6

36.     ARGOSY called Plaintiff's cellular number for the purpose of "telemarketing" as this term is defined by 16 C.F.R. § 310.2(gg) and in doing so, ARGOSY acted as either a "seller" or "telemarketer" as these terms are defined by 16 C.F.R. § 310.2(dd).

37.     Plaintiff did not provide ARGOSY with "prior express written consent" to allow ARGOSY to transmit telemarketing messages to Plaintiff's cellular number.

38.     As discussed below, on information and belief, the calls that ARGOSY placed to Plaintiff's cellular number were placed with an automatic telephone dialing system as defined by the TCPA.

39.     Alternatively, as discussed below, on information and belief, the calls to Plaintiff's cellular phone were placed with "predictive dialer" as this term has been defined by the Federal Communications Commission ("FCC").

40.     When Plaintiff answered some of ARGOSY'S calls, to the best of his information, knowledge and belief, he recalls that he was met with a period of silence followed by an automated click at which point the call would sometimes connect to a human.

41.     When Plaintiff answered some of ARGOSY'S calls, to the best of his information, knowledge and belief, he recalls receiving prerecorded messages from ARGOSY that advertised and/or promoted the commercial availability of ARGOSY'S educational services.

42.     The unsolicited telemarketing calls to Plaintiff's cellular number violated the TCFPA because the actual and/or dropped calls were annoying harassing and/or abusive.  *See* 16 C.F.R. § § 310.4(b)(1)(i) and (iv).

43.     Further, as discussed below, the prerecorded messages did not comply with the disclosure requirements set forth by *See* 16 C.F.R. § § 310.4(b)(1)(v).

7

## IV.    SUMMARY THE TCPA AND TCFPA AND DEFENDANTS' MISCONDUCT

### A. The Telephone Consumer Protection Act

44.    Congress enacted the TCPA to regulate and prohibit certain types of automated and prerecorded telemarketing calls.

45.    In enacting the TCPA, Congress wrote that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call...." Telephone Consumer Protection Act of 1991, Pub. L. 102–243, §§ 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991).

46.    Congress wrote that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer. *Id.* at § 11.

47.    Congress wrote that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* at § 12.

48.    Section 227(b)(3)(A) of the TCPA states that "[a] person or entity may . . . bring . . . (A) an action based on a violation of this subjection or the regulations prescribed under this subjection to enjoin any such violation."

49.    Section 227(b)(3)(B) of the TCPA provides for a minimum of $500 in damage for each such violation" of subsection 227(b)(1)(A)(iii).

50.    Section 227(b)(3)(C) of the TCPA states:

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

51.    47 CFR § 64.1200(f)(1) states that "[t]he term *advertisement* means any

8

material advertising the commercial availability or quality of any property, goods, or services."

52.     47 CFR § 64.1200(f)(2) states that "[t]he terms *automatic telephone dialing system* and *autodialer* mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers."

53.     Pursuant to 47 CFR § 64.1200(f)(8), the term "prior express written consent" means:

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

54.     Section 64.1200(f)(8) states that a written agreement shall:

> (i) . . . include a clear and conspicuous disclosure informing the person signing that:
>
> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and
>
> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

55.     47 CFR § 64.1200(f)(8)(ii) states that "[t]he term 'signature' shall include an electronic or digital form of signature . . . ."

56.     47 CFR § 64.1200(f)(9) states that "[t]he term *seller* means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."

57.     47 CFR § 64.1200(f)(11) states that "[t]he term *telemarketer* means the

person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."

58.     47 CFR § 64.1200(f)(12) states that "[t]he term *telemarketing* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

59.     47 CFR § 64.1200(f)(14) states that "[t]he term *telephone solicitation* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person . . . ."

60.     47 CFR § 64.1200(f)(15) states that "[t]he term *unsolicited advertisement* means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise."

61.     Pursuant to authority granted by the TCPA, the FCC has issued regulations regarding prerecorded telephone messages.  47 U.S.C. § 227(b)(2).

62.     47 CFR 64.1200(b)(1) states:

(b) All artificial or prerecorded telephone messages shall:

> (1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with State Corporation Commission (or comparable regulatory authority) must be stated.

63.     The FCC's *Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991; Final Rule,* FR Doc 03-18766, <u>68 Fed. Reg. 143</u>, at pg. 44163 "2003 Final Rule" contains the following:

With respect to the caller's name, the prerecorded message must contain, at a minimum, the legal name under which the business, individual or entity calling is registered to operate. The Commission recognizes that some businesses use "d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, provided the legal name of the business is also stated.

The FCC's 2003 Final Rule can be found at https://www.gpo.gov/fdsys/pkg/FR-2003-07-25/pdf/03-18766.pdf

64.     47 CFR § 64.1200(b)(2) states:

(b) All artificial or prerecorded telephone messages shall:

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity or individual.

65.     47 CFR § 64.1200(b)(3) states:

In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a [cellular telephone service], provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism, must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call . . . .

66.     In 2003, the FCC declared that a "predictive dialer"[1] is an automated dialing system for the purposes of the TCPA.

---

[1] While Defendant(s) may disagree with the analysis performed by the FCC, as well as the FCC's conclusion that a predictive dialer constitutes an automated dialing system for the purposes of enforcing the TCPA, these allegations are intended to identify *what the FCC has publically stated*. Thus, while Defendants may intend to argue that these allegations need not be answered on the grounds that they constitute "legal conclusions", FRCP 8()(1)(B) requires a party to "admit or deny the allegations asserted against it" and FRCP 8(b)(2) states that "[a] denial must fairly respond to the substance of the allegation." Further, FRCP (b)(6) states that "[a]n allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."

67.     According to the FCC:

> A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because the dialer simply hangs up when no telemarketer is free to take the call.

See 2003 FCC Order at fn. 31, https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf

68.     The 2003 FCC Order explained how predictive dialers can be "set" to call consumers:

> Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (i.e., the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone.

2003 FCC Order at fn. 32.

69.     The 2003 FCC Order discussed how predictive dialers attempt "to 'predict' the average time it takes for a consumer to answer the phone."

70.     Paragraph 146 of the 2003 FCC Order states:

> Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air." (footnote omitted).

71.     2003 FCC Order discussed how the use of predictive dialers result in "dead air" or hang-ups:

> the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers.

2003 FCC Order, ¶ 91.

72.    Paragraph 8 of the 2003 FCC Order discussed how predictive dialers "frequently abandon calls before a telemarketer is free to take the next call." 2003 FCC Order, Paragraph 8 (footnotes omitted).

73.    The Court may take judicial notice that the FCC released a "Notice of Proposed Rulemaking and Memorandum Opinion and Order" ("2002 FCC Order") on September 18, 2002. The 2002 FCC Order can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-02-250A1.pdf

74.    The 2002 FCC Order described the number and types of consumer complaints that it had received regarding "autodialers" and "predictive dialing":

> In 1991, the Commission received a total of 757 complaints regarding calls placed to subscribers by autodialers. From June 2000 to December 2001, the Commission received over 1,500 inquiries about predictive dialing alone. In addition, the consumer alert titled "Predictive Dialing: Silence on the Other End of the Line" has received over 16,000 hits on the Commission's website since the alert was posted in February of 2001.

2002 FCC Order, ¶ 26 (footnote omitted).

75.    The 2002 FCC Order explained how predictive dialers result in "disconnected" calls:

> In addition to automatically dialing numbers, predictive dialers are set up to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call. When a consumer answers the telephone, a predictive dialer transfers the call to an available telemarketer. When a predictive dialer simultaneously dials more numbers than the telemarketers can handle, some of the calls are disconnected. The consumer may hear silence on the line as the call is being transferred or a "click" as the call is disconnected.

2002 FCC Order, ¶ 26 (footnote omitted).

76.     The 2002 FCC Order identified why "computerize calls" annoy citizens:

> "Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall . . . [O]wning a telephone does not give the world the right and privilege to assault the consumer with machine-generated telephone calls." 137 CONG. REC. S9874 (July 8, 1991)(statement of Sen. Hollings).

2002 Order, fn. 90.

77.     The Court may take judicial notice that the FCC released a Declaratory Ruling on January 4, 2008 ("2008 FCC Ruling"). A copy of the 2008 FCC Ruling can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

78.     The 2008 FCC Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." 2008 FCC Ruling at ¶ 12.

79.     The 2008 FCC Ruling states that it "first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions." See, 2008 FCC Ruling at ¶ 13.

80.     The 2008 FCC Ruling described the 2002 FCC Order as follows:

> The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress. The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.

2008 FCC Ruling at ¶ 13 (footnotes omitted).

81.     The Seventh Circuit in *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) described how predictive dialers work "autonomously." According

to the Seventh Circuit's opinion in *Soppet*:

> The machine, called a predictive dialer, works autonomously until a human voice comes on the line. If that happens, an employee in Bill Collector's call center will join the call. But Customer no longer subscribes to Cell Number, which has been reassigned to Bystander. A human being who called Cell Number would realize that Customer was no longer the subscriber. But predictive dialers lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master.
>
> Meanwhile Bystander is out of pocket the cost of the airtime minutes and has had to listen to a lot of useless voicemail. (We use Bill Collector as the caller, but this simplified description could as easily use an advertiser that relies for consent on earlier transactions with Customer, or a box that Consumer checked on a vendor's web site.)

*Id.* at 638.[2]

82.     On information and belief, ARGOSY called Plaintiff's cellular telephone with a predictive dialer as defined by the FCC given the fact that Plaintiff recalls hearing prerecorded messages being played during the calls in question.

83.     Just like the plaintiffs in *Soppet*, Plaintiff "had to listen to a lot of useless voicemail" because he never authorized Defendants to call his cellular number for telemarketing purposes.

84.     As set forth above and detailed below in Section V, Defendant(s) violated the TCPA.

85.     Even if Defendant claims that it did not place or make any of the calls or messages at issue, it can be liable for the conduct of the persons who placed or made the calls and messages.

---

[2] The court was referencing the "Sorcerer's Apprentice" scene from Disney's "Fantasia". The scene can be found at http://video.disney.com/watch/sorcerer-s-apprentice-fantasia-4ea9ebc01a74ea59a5867853. Mickey Mouse's mischief begins at the 1:30 mark as well as the 2:00 mark. The result of Mickey's mischief, as referenced by the Seventh Circuit, starts at the 5:10 mark, continuing until the 8:20 mark, where the Sorcerer in question, retrieves his magical hat and saves Mickey from his mischief.

86. On May 9, 2013, the FCC issued a Declaratory Ruling which stated that a creditor or seller of services can be liable under the TCPA for calls placed on its behalf:

> we clarify that while a seller does not generally "initiate" calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers.[3]

**B. Telemarketing and Consumer Fraud and Abuse Prevention Act**

87. Congress enacted the TCFPA to protect consumers from "deceptive telemarketing actions or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102.

88. In enacting the TCFPA, Congress made the "following findings":

(1) Telemarketing differs from other sales activities in that it can be carried out by sellers across State lines without direct contact with the consumer. Telemarketers also can be very mobile, easily moving from State to State.

(2) Interstate telemarketing fraud has become a problem of such magnitude that the resources of the Federal Trade Commission are not sufficient to ensure adequate consumer protection from such fraud.

(3) Consumers and others are estimated to lose $40 billion a year in telemarketing fraud.

(4) Consumers are victimized by other forms of telemarketing deception and abuse.

(5) Consequently, Congress should enact legislation that will offer consumers necessary protection from telemarketing deception and abuse.

15 U.S.C. § 6101.

---

[3] The 2013 FCC Order is hosted at https://apps.fcc.gov/edocs_public/attachmatch/FCC-13-54A1_Rcd.pdf

89.     15 U.S.C. § 6104(a) of the TCFPA provides a private right of action for "[a]ny person adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of" the TCFPA.

90.     ARGOSY's unsolicited and/or unwanted telephone calls and prerecorded messages constitute a pattern or practice of telemarketing in violation of the TCFPA.

91.     ARGOSY called Plaintiff's cellular number for the purpose of "telemarketing" as this term is defined by 16 C.F.R. § 310.2(gg) and in doing so, ARGOSY acted as either a "seller" or "telemarketer" as these terms are defined by 16 C.F.R. § 310.2(dd).

92.     16 C.F.R. § 310.2(gg) defines "telemarketing to mean "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call."

93.     16 C.F.R. § 310.2(dd) defines "seller" to mean "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

94.     16 C.F.R. § 310.2(ff) defines "telemarketer" to mean "any person who, in connection with a telemarketing initiates or receives telephone calls to or from a customer[.]"

95.     When ARGOSY called Plaintiff, Plaintiff was called as a consumer as the term is defined by 16 C.F.R. § 310.2(n).  16 C.F.R. § 310.2(n) defines "customer" to mean, "any person who is or may be required to pay for goods or services offered through telemarketing."

96.     In enacting the TCFPA, Congress authorized the Federal Trade Commission ("FTC") to institute rules prohibiting "abusive telemarketing acts or practices."

97.     Congress authorized the FTC to preclude persons from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy."

98.     15 U.S.C. § 6106(4) and 16 C.F.R. § 310.2(gg) define the term "telemarketing" to mean "a plan, program, or campaign which is conducted to induce purchases of goods or services, . . . by use of one or more telephones and which involves more than one interstate telephone call.

99.     The telephone calls to Plaintiff by and on behalf of the Defendants were acts of "telemarketing" as defined by 15 U.S.C. § 6106(4).

100.    16 C.F.R. § 310.2(dd) defines "seller" to mean "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

101.    16 C.F.R. § 310.2(ff) defines "telemarketer" to mean "any person who, in connection with a telemarketing initiates or receives telephone calls to or from a customer[.]?

102.    When ARGOSY called Plaintiff, Plaintiff was called as a consumer as the term is defined by 16 C.F.R. § 310.2(n).  16 C.F.R. § 310.2(n) defines "customer" to mean, "any person who is or may be required to pay for goods or services offered through telemarketing."

103.    16 C.F.R 310.4(a), prohibits "[a]busive telemarketing acts or practices", and provides that "[i]t is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in" certain prohibited conduct.

104.    16 C.F.R 310.4(a)(8) states that "[i]t is an abusive telemarketing act or practice and a violation of this Rule" when a seller or telemarketers "[f]ail[s] to transmit

or cause to be transmitted the telephone number, and . . . the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call[.]"

105.    16 C.F.R 310.4(b)(1) states that "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in" certain prohibited conduct.

106.    16 C.F.R 310.4(b)(1) identifies the following prohibited conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with paragraph (b)(1)(iii)(A) of this section, including, but not limited to, harassing any person who makes such a request; hanging up on that person; failing to honor the request; requiring the person to listen to a sales pitch before accepting the request; assessing a charge or fee for honoring the request; requiring a person to call a different number to submit the request; and requiring the person to identify the seller making the call or on whose behalf the call is made;

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services

(iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

> (i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

> (ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

> (iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

> (iv) Includes such person's telephone number and signature;

> (v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

\* \* \*

(B) In any such call to induce the purchase of any good or service, . . . the seller or telemarketer:

> (i) Allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

> (ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by § 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

>> (A) In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must:

>> (1) Automatically add the number called to the seller's entity-specific Do Not Call list;

>> (2) Once invoked, immediately disconnect the call; and

(3) Be available for use at any time during the message[.]

107.     As set forth above and detailed below in Section V, Defendant violated the TCFPA.

## V.     CAUSES OF ACTION

### Count I – Defendants Violated the TCPA

108.     Plaintiff incorporates the above paragraphs as if fully set forth above.

109.     ARGOSY's records show that it placed calls to (815)-XXX-4921.

110.     Section 227(b)(1)(A)(iii) of the TCPA makes it unlawful to use any "automatic telephone dialing system" or an "artificial or prerecorded voice" to call a person's cellular telephone number "with[out] the prior express consent of the called party."

111.     Plaintiff never provided "prior express written consent" to ARGOSY to allow or otherwise authorize it to call Plaintiff's cellular number with an "automatic telephone dialing system or an artificial or prerecorded voice."

112.     Plaintiff never signed any document that contained any of the requirements set forth by 47 CFR § 64.1200(f)(8).

113.     The messages left on or played on Plaintiff's cellular telephone were telemarketing messages as defined by 47 CFR § 64.1200(f)(12).

114.     Without Plaintiff's prior express invitation or permission, ARGOSY called Plaintiff's cellular telephone with an "automatic telephone dialing system" or "autodialer" for the purpose delivering a "telephone solicitation" as these terms defined by 47 CFR § 64.1200(f)(2) and (14).

115. ARGOSY called Plaintiff's cellular telephone with an "automatic telephone dialing system" or "autodialer" because the calls placed by ARGOSY utilized prerecorded messages rather than live operators.

116. Alternatively, ARGOSY called Plaintiff's cellular phone with a "predictive dialer" as this term is defined by the FCC.

117. Plaintiff never executed an electronic or digital form of a signature authorizing any of the Defendants to call him for the purpose of a "telephone solicitation" as defined by 47 CFR § 64.1200(f)(14).

118. Without Plaintiff's prior express invitation or permission, ARGOSY called Plaintiff's cellular telephone with an "automatic telephone dialing system" or "autodialer" for the purpose delivering an "unsolicited advertisement" as these terms defined by 47 CFR § 64.1200(f)(2) and (15).

119. The pre-recorded messages played or left on Plaintiff's cellular phone/voice mail did not comply with 47 CFR § 64.1200(b)(3) because none of the prerecorded messages contained language offered Plaintiff the ability of to opt-out of future prerecorded messages.

120. On information and belief, ARGOSY called Plaintiff's cellular phone and left messages that utilized an artificial voice.

121. Plaintiff believes that ARGOSY called his cellular telephone with an "automatic telephone dialing system" or "autodialer" because the calls utilized prerecorded messages rather than live operators.

122. Alternatively, ARGOSY called Plaintiff's cellular phone with a "predictive dialer" as this term is defined by the Federal Communications Commission ("FCC").

123. Plaintiff believes that ARGOSY called his cellular telephone with a "predictive dialer" as defined by the FCC because the calls utilized prerecorded messages

rather than live operators.

124.    Plaintiff never consented to receiving a "telephone solicitation" calls from Defendants and never expressly consented (in writing or otherwise) to allow Defendants to call his cellular number with an "automatic telephone dialing system" or "artificial or prerecorded voice."

125.    ARGOSY violated Section 227(b)(1)(A)(iii) of TCPA by calling Plaintiff's cellular number for telemarketing purposes without first having obtained his prior express written to call him with an "automatic telephone dialing system" or "artificial or prerecorded voice.

126.    ARGOSY violated Section 227(b)(1)(A)(iii) by calling Plaintiff's cellular number using automatic telephone dialing system or predictive dialer without having obtained express written consent to do so.

127.    ARGOSY violated Section 227(b)(1)(A)(iii) by calling Plaintiff's cellular number using an artificial or prerecorded voice without having obtained express written consent from Plaintiff.

128.    ARGOSY violated 47 CFR § 64.1200(b)(1) because none of the artificial or prerecorded voice telephone messages stated that the calls were being placed by "The University of Phoenix, Inc."

129.    ARGOSY violated § 64.1200(b)(3) because they used artificial and/or prerecorded messages which did not comply with § 64.1200(b)(3) because its/their messages did not contain "an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request."

130.    As a result of these violations, Plaintiff and a nationwide class of similarly situated persons are entitled to at least $500 per violation and up to $1,500 per violation.

131.   DREAM CENTER is liable for calls placed by ARGOSY.

WHEREFORE, Plaintiff TERRANCE WILLIAMS and similarly situated putative class members are entitled to the following relief:

    a. Declaratory relief in the form of declaring that the telephone calls placed by that Defendants violated the TCPA;

    b. Statutory damages of at least $500 and up to $1,500 for each violation; and

    c. Injunctive relief to prohibit future violations of the TCPA.

**Count II – Defendants Violated the TCFPA**

132.   Plaintiff incorporates the above paragraphs as if fully set forth above.

133.   ARGOSY violated 16 C.F.R 310.4(b)(1)(i) because when it/they called Plaintiff, the volume of calls was such that the calls (daily at times) were made "repeatedly or continuously with the intent to annoy, abuse, or harass" Plaintiff.

134.   As detailed above, the telephone calls that ARGOSY placed violated 16 C.F.R 310.4(b)(1)(iii) because it continued to initiate calls to Plaintiff's cellular number after he told ARGOSY to stop calling.

135.   As detailed above, the telephone calls that ARGOSY placed violated 16 C.F.R 310.4(b)(1)(iv)(A) because it/they frequently abandoned telephone calls, leaving Plaintiff to have to listen to the type of "dead air" identified above.

136.   As detailed above, the telephone calls that ARGOSY placed violated 16 C.F.R 310.4(b)(1)(v)(A) by calling Plaintiff's cellular numbers and playing prerecorded messages to induce them to purchase online educational services without their express written consent.

137.   As detailed above, the telephone calls that ARGOSY made violated 16 C.F.R 310.4(b)(1)(v)(B) by calling Plaintiff's cellular numbers without playing the disclosures required by 16 C.F.R 310.4(b)(1)(v)(B)(ii)(A).

138.    On information and belief, ARGOSY'S above misconduct and non-compliance with the TCPA and TCFPA towards Plaintiff took place on a class wide basis, thus satisfying the statutory threshold for a TCFPA claim.

WHEREFORE, Plaintiff TERRANCE WILLIAMS and similarly situated putative class members are entitled to the following relief:

a.  Declaratory relief in the form of declaring that the telephone calls placed by that PHOENIX and/or APOLLO violated the TCFPA;

b.  Statutory damages of at least $500 and up to $1,500 for each violation;

c.  Reasonable attorney's fees and costs; and

d.  Injunctive relief to prohibit future violations of the TCFPA.

**Count III – the Illinois Automatic Telephone Dialers Act**

139.    Plaintiff incorporates the above paragraphs as if fully set forth above.

140.    Plaintiff WILLIAMS is asserting a claim (individually and as a class representative) pursuant to Illinois Automatic Telephone Dialers Act ("IATDA"), 815 ILCS 305, et seq. which prohibits the playing of prerecorded messages without the consent of the called party.

141.    ARGOSY violated 815 ILCS 305/30 by calling Plaintiff's cellular number with a prerecorded message without his consent.

142.    A plaintiff is entitled to at least $500 and up to $1,500 for each violation of the IATDA.  *See, e.g.,* 815 ILCS 305/30(c-5), plus costs and reasonable attorney's fees.

WHEREFORE, Plaintiff TERRANCE WILLIAMS and similarly situated putative class members are entitled to the following relief:

a.  Declaratory relief in the form of declaring that the telephone calls placed by that ARGOSY violated the IATDA;

    b.   Statutory damages of at least $500 and up to $1,500 for each violation;

    c.   Reasonable attorney's fees and costs; and

    d.   Injunctive relief to prohibit future violations of the IATDA.

## VI.   PLAINTIFF HAS SUFFERED CONCRETE INJURIES

143.   The Supreme Court had recognized that "[v]oluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 744 (2012).

144.   The Supreme Court has also recognized that in enacting the TCPA, Congress made specific findings that "unrestricted telemarketing can be an intrusive invasion of privacy" and are a "nuisance." *Mims,* 132 S. Ct. at 745.

145.   In discussing whether a statutory violation affords a person Article III standing to assert a cause of action in federal court, the Supreme Court recognized that Congress has the power to enact laws to elevate certain harms "to the status of legally cognizable injuries." *Spokeo, Inc., v. Robbins*, 136 S. Ct. 1540, 1549 (2016).

146.   *Spokeo* stated that "both history and the judgment of Congress play important roles" and "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements...Congress may 'elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Id.*

147.   *Spokeo* recognized that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.* *Spokeo* also recognized that "a plaintiff . . . need not allege any additional harm beyond the one Congress has identified."

148.    After the Supreme Court's June 17, 2016, decision in *Spokeo*, courts in the following TCPA cases held that plaintiffs properly alleged concrete and legally cognizable harms. *See, e.g., Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017) (holding that Article III standing existed where a TCPA plaintiff received a a "single solicitation" to her cell phone from a fitness company that resulted in the "receipt of [a] call and voicemail"); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect"); *Hossfeld v. Compass Bank*, 2017 U.S. Dist. LEXIS 182571, *14-15 (N.D. Al. Nov. 3, 2017) ("Mr. Hossfeld has undoubtedly cleared the particularity hurdle and asserted a personal connection to the harm claimed that is sufficient to establish this prong of the standing requirement. The two unsolicited calls described in Ms. Hossfeld's first amended complaint were made to his personal cell phone number. (Doc. 12 at 4 ¶ 17). Mr. Hossfeld further alleges how those automatically-dialed calls impacted him personally—they temporarily deprived him from being able to use his cell phone, invaded his privacy, wasted his time, and reduced his cell phone's battery's life. (Doc. 12 at 7 ¶ 40)."); <u>*Etzel v. Hooters of Am., LLC*</u>, 223 F. Supp. 3d 1306, 1311, 1312 (N.D. Ga. 2016) (rejecting application of *de minimis* rule to "a lone text message after withdrawal of consent" (internal quotation marks omitted) given "the [unambiguous] language of the TCPA . . . that a violation can occur from a single call" under § 227(b)(1)(A) in contrast to § 227(c)(5) which requires more than one call); <u>*Cabiness v. Educ. Fin. Solutions, LLC*</u>, 2016 U.S. Dist. LEXIS 142005, 2016 WL 5791411, at *5-6 (N.D. Cali. Sept. 1, 2016)(a violation of the TCPA "is sufficient on its own to constitute an injury in fact" because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm"); <u>*Cour v. Life360, Inc.*</u>, 2016 U.S. Dist.

LEXIS 98945, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding concrete injuries where plaintiff alleged he received one text message in violation of the TCPA).

**VII.    THE ELEMENTS OF FRCP 23 ARE MET**

149.    A nationwide TCPA class can be defined as follows: *all persons in the United States who were called on their cellular phones within the last four years by Defendants though the use of an autodialer and/or predictive dialer in violation of the TCPA.*

150.    A second nationwide TCPA class can be defined as follows: *all persons in the United States who were called on their cellular phones within the last four years by Defendants though the use of prerecorded and/or artificial messages in violation of the TCPA.*

151.    A third nationwide TCPA class can be defined as follows: *all persons in the United States who were called on their cellular phones within the last four years by Defendants where Defendants' prerecorded messages did not comply with the TCPA.*

152.    A TCFPA nationwide class can be based upon Defendants' violations of the TCFPA: *all residents of the United States who were called within the last three years by Defendants though the use of an autodialer and/or predictive dialer in violation of the TCFPA.*

153.    A second nationwide TCFPA class can be defined as follows: *all persons in the United States who were called within the last three years by Defendants though the use of prerecorded and/or artificial messages in violation of the TCFPA.*

154.    A third nationwide TCFPA class can be defined as follows: *all persons in the United States who were called within the last three years by Defendants where Defendants' prerecorded messages did not comply with the TCFPA.*

155.    An additional Illinois-based class based upon violation of the Illinois Automatic Telephone Dialers Act can be defined set forth as follows: *all residents of the State of Illinois called by Defendants with a prerecorded message.*

156.    The putative class members can be administratively ascertained from business records maintained by Defendant(s).  These records can be examined to identify the types of calling systems utilized, whether prerecorded or artificial voice messages were used and whether consent was provided and/or revoked. *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (finding that the Plaintiffs' proposed class was ascertainable because the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

157.    A defendant in a TCPA action bears the burden of demonstrating consent.

158.    Defendant(s) may seek to exclude from these proposed classes people who consented to the calls and messages in question.

159.    Excluded from the Classes are Defendants, their agents, subsidiaries, parents, successors, predecessors, and any entity in which those parties, or their parents have a controlling interest, and those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family and staff, (3) any person who executes and files a timely request for exclusion from the Class, (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded, adjudicated and/or otherwise released person.

160.    Plaintiff reserves the right to modify the class definitions to negate any efforts by Defendant(s) to suggest that the above classes are failsafe classes.

### A.  Numerosity

161.  Numerosity is satisfied because Defendant(s) called hundreds of persons in the same manner that Defendants called Plaintiff:  (a) through dialing technology prohibited by the TCPA (either an automated dialing system, predictive dialer, prerecorded messages and/or artificial messages); (b) without consent of the persons called; and in a manner contrary to the requirements of TCFPA.

162.  Joinder of all members of the Class is impracticable.

163.  There are hundreds to thousands of Class members based upon Defendant ARGOSY'S position as a leader in its field.

### B.  Commonality and Predominance

164.  The elements of is commonality and predominance are satisfied.

165.  As to the TCPA based classes, commonality exists because Defendant(s) acted in a common manner toward Plaintiff and the proposed class members by calling Plaintiff and the proposed class members in the same way:  (a) through dialing technology prohibited by the TCPA (either an automated dialing system, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

166.  There are several questions of law and fact common to the claims of Plaintiff and members of the proposed classes, including;

> a.  whether the dialing systems used by Defendant(s) qualify as an automated telephone dialing system or a predictive dialer under the TCPA;
>
> b.  whether Defendant(s) violated the TCPA and TCFPA;
>
> c.  whether alleged  conduct violated the Illinois Automatic Telephone Dialers Act;
>
> d.  whether Defendant(s) can demonstrate consent or compliance with the various statutes; and

e. whether the conduct described herein was intentional so as to warrant treble or punitive damages.

**C. Typicality**

167. Plaintiff's claims are typical of the claims of the proposed Class, as the calls that Defendant(s) placed were the same or substantially similar to those received by the proposed class members.

168. Plaintiff's and the proposed class members' claims all arise from the same operative facts and are based on the same legal causes of action.

169. Plaintiff and each of the proposed class member are all subject to the same illegal calling techniques employed by Defendant(s).

**D. Appropriateness and Superiority**

170. A class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy.

171. The common questions of law and fact enumerated above predominate over questions affecting only individual Class members.

172. The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

**E.** As such, the expense and burden of individual litigation would make it impracticable for proposed Class members to prosecute their claims individually.

**Plaintiff(s) and Class Counsel Are Adequate**

173. Class Counsel and Plaintiff will fairly, adequately and vigorously represent and protect the interests of the proposed class members and has/have no interest antagonistic to those of the Class.

174. There are no defenses unique to Plaintiff(s).

175.   Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator who has defended over a hundred consumer-based claims since 1998 and has litigated over four dozen TCPA based putative class actions.

176.   In conjunction with class counsel, Mr. Vlahakis has obtained Court approval of numerous TCPA class actions.   *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar TCPA based automated dialing system settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar TCPA based automated dialing system wrong party settlement); *INSPE Associates v. CSL BIotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement).

177.   Additionally, Mr. Vlahakis (as a former consumer class action defense attorney) has gained court approval of dozens of numerous FDCPA class actions.

178.   Mr. Vlahakis understands the types of defenses that are raised in TCPA class action as he defeated a TCPA class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).

179.   Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012).

180.   In litigating TCPA class actions, Mr. Vlahakis has ascertained the identities of putative class members individually and in conjunction with industry experts.

181.   Mr. Vlahakis has litigated petitions for declaratory relief before the FCC.

182.   Mr. Vlahakis' co-counsel are highly competent and experienced class action attorneys.

**F.      Injunctive and Declaratory Relief Are Warranted**

183.    FRCP 23(b)(2) provides that injunctive and declaratory relief are proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class."

184.    Here, the above violations apply generally to the proposed classes.

185.    For the above reasons, this Court should declare Defendants' misconduct unlawful and enjoin Defendants from further violating the TCPA and TCFPA.


***Plaintiff hereby demands a trial of this civil action by jury.***

Respectfully submitted,


Plaintiff TERRANCE WILLIAMS, individually
and on behalf of all others similarly situated,

By:  __s/James Vlahakis_____
James Vlahakis (lead counsel)

SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456 telephone
jvlahakis@sulaimanlaw.com

*Additional counsel*

Ahmad T. Sulaiman ahmad.sulaiman@sulaimanlaw.com

Omar T. Sulaiman osulaiman@sulaimanlaw.com